```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/12/2018
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RINO GALENTE,

                Plaintiff,

 – against –

ACTING COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

**OPINION**

1:16-cv-09981 (KHP)

Rino Galente ("Plaintiff") commenced this action against Defendant Commissioner of the Social Security Administration (the "Commissioner"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's decision that Plaintiff's disability under Sections 216(i) and 223(f) of the Act ended as of September 27, 2013.

At my direction, the parties filed a Joint Stipulation that sets out their respective positions in lieu of cross-motions for judgment on the pleadings. (Doc. No. 20.) For the reasons set forth below, the Commissioner's motion is GRANTED and Plaintiff's motion is DENIED.

## BACKGROUND

### I.    *Summary Of Claim And Procedural History*

Plaintiff suffers from knee impairments stemming from a motor vehicle accident. (Administrative Record ("Tr.") 281.) Since at least 2008, Plaintiff has been treated by numerous doctors, underwent knee surgery, and has been taking pain medicine, all with varying degrees of success.

In 2010, the Social Security Administration ("SSA") found Plaintiff disabled as of April 2, 2008, at which time Plaintiff's medically-determined impairments included bilateral knee

impairments that met Listing 1.03 (reconstructive surgery or surgical arthrodesis of a joint(s) (due to any cause)). (Tr. 99-102.); 20 C.F.R. Part 404, Subpart P, Appendix 1. On July 26, 2013, Plaintiff's disability was determined to have continued until that date. (Tr. 103-04.) However, the SSA subsequently decided that as of September 27, 2013, Plaintiff was no longer disabled due to medical improvement. (Tr. 122-24.) On March 12, 2014, this determination was upheld upon reconsideration after a disability hearing by a state agency Disability Hearing Officer. (Tr. 126- 28.)

Plaintiff timely filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 141.) On August 4, 2015, Plaintiff appeared with counsel and testified at a hearing held before ALJ Vincent M. Cascio. (Tr. 59-94.) Robert Baker, an impartial vocational expert, also testified at the hearing. (*Id.*)

On August 27, 2015, the ALJ issued a written decision upholding the determination that Plaintiff was no longer disabled. (Tr. 11-28.) Plaintiff appealed the ALJ's decision to the Appeals Council, which denied Plaintiff's request for review on December 2, 2016. (Tr. at 1.) Consequently, Plaintiff filed the instant action, seeking review of the ALJ's decision. (Doc. No. 1.)

## II.    *The Administrative Record*

The Parties have stipulated to the following statement of facts, (*see* Doc. No. 20), which the Court summarizes below.

### a.  *Non-Medical Evidence*

#### i.  *CDIU's Summary Report Of Investigation*

In September 2012, the Cooperative Disability Investigations Unit ("CDIU") received a

referral from SSA for a review and surveillance of Plaintiff to determine his level of functioning as part of SSA's continuing disability review. (Tr. 284.) The CDIU noted that Plaintiff had sustained injuries to his right knee in 1994 and 2007, which necessitated surgeries. (Tr. 283.) The result of the CDIU's investigation is set forth in a Summary Report of Investigation ("CDIU Report") dated July 20, 2013. (Tr. 280-88.)

On October 26, 2012, a New York State ("NYS") investigator conducted surveillance of Plaintiff near his residence in New York. (Tr. 285.) The investigator reported that he observed Plaintiff parking a white van with Plaintiff's first name ("Rino") painted on it. (*Id.*) The van had a ladder on the roof and lettering stating: "Handy-Man Plus, Residential Specialist, Home Improvement and Licensed and Insured," and provided a telephone number. (*Id.*) Plaintiff was seen exiting the driver's seat of the vehicle and entering and exiting a store. (Tr. 285.) According to the investigator, during this surveillance, Plaintiff did not exhibit any obvious physical limitations or restrictions. (*Id.*) He entered and exited his vehicle, walked without any obvious difficulty, and did not use a cane. (*Id.*) Plaintiff also did not display any pain, fatigue, or unsteadiness, and he drove his van, shopped, and ambulated in a normal manner. (*Id.*)

On April 11, 2013, NYS investigators conducted a second surveillance of Plaintiff. (Tr. 286.) They observed Plaintiff driving a car to SSA's District Office in New York. (Tr. 286.) According to the investigators, Plaintiff was observed walking into and out of two buildings holding his cane in his hand, rather than using the cane. (Tr. 286-87.) Plaintiff did not display any pain, fatigue, or unsteadiness, was able to lift and carry items, and drove his vehicle and functioned independently in a normal manner. (Tr. 286-87.)

On July 12, 2013, NYS investigators conducted a third surveillance of Plaintiff in New

York. (Tr. 287.) According to the investigators, Plaintiff was wearing a knee brace on each knee and was seen touching a cane to the ground with every other step, without appearing to put much weight on the cane. (*Id*.) He walked at a normal rate and was later seen carrying the cane without using it. (*Id*.) He was also observed that same day exiting his vehicle and entering a restaurant without his cane. (*Id*.) During the surveillance, Plaintiff did not exhibit any obvious physical limitations or restrictions, and he did not display any pain, fatigue, or unsteadiness. (*Id*.)

### ii. *The August 4, 2015 Administrative Hearing*

On August 4, 2015, a hearing concerning Plaintiff's continued disability was held at Plaintiff's request. (Tr. 59-94.) Plaintiff appeared with counsel, and a vocational expert also testified at the hearing. (*Id*.) Counsel represented to the ALJ that the medical evidence was up-to-date and otherwise complete. (Tr. 63, 92.)

Plaintiff testified that he had an Anterior Cruciate Ligament ("ACL") reconstruction surgery, a second surgery to replace a knee ligament, and eventually total knee replacement in his right knee, and that delay in surgery caused over-use damage to the cartilage in his left knee and discomfort in his right foot. (Tr. 66-67, 70-71.) He took Percocet for the pain, which allowed him to walk around and move. (*Id*.) Plaintiff testified that he was also waiting for the Worker's Compensation Board to approve revision surgery on his right knee, and waiting for injections and other surgery for his left knee. (Tr. 67.)

Plaintiff testified that he could walk "500 to a thousand feet with no problem probably," but that it was difficult for him to sit, including during the hearing, because he also had back pain. (Tr. 71-72.) Plaintiff estimated that he could sit at most ten minutes, stand in

place for five to ten minutes, and lift or carry about three pounds "at least." (Tr. 72.) Plaintiff testified that he had no problems using his hands but felt pain in his back and shoulders when he reached over his head, and he had problems going up and down stairs. (*Id.*) Plaintiff stated that he had some difficulty taking a shower and dressing himself, but he was able to manage with Percocet. (Tr. 77.) Plaintiff also noted difficulty walking on any surface due to problems with his back, both knees, and the arches of his feet. (Tr. 81.) Plaintiff reported constipation as a side effect of Percocet. (Tr. 78.)

Plaintiff testified that he always wore a knee brace and used a cane most of the time. (Tr. 72-73, 80-81.) He explained, that on occasion, he tried to practice keeping his balance without the cane, which he was able to do when he took Percocet, and that his doctor, Dr. Zelicof, advised him not to constantly use his cane to strengthen his muscles. (Tr. 72-73, 80.) Plaintiff reported going to physical therapy once a week, which was helpful. (Tr. 73.)

Plaintiff testified that he lived alone and did his own chores, which included wiping down the counters and wooden floors, using the microwave for meals, shopping every four days for essentials, and doing laundry once every two-to-three weeks in the house, (Tr. 69, 78), while his son did the yard work. (Tr. 79.) Plaintiff testified that he could not afford to go out socially and spent his day watching TV, going to therapy, and going to the gym for 15-30 minutes so that he could try to walk correctly with the help of his cane. (Tr. 79-80.) Plaintiff testified that he had a valid driver's license and drove to doctor's appointments, physical therapy, and stores for food and other essentials. (Tr. 70.)

Plaintiff testified that he completed the eleventh grade and then obtained a General Equivalency Diploma. (Tr. 70.) Around 2005/2006, Plaintiff worked at HK Laundry Equipment,

where he cleaned vents, dryers, and hoses. (Tr. 82.) Plaintiff injured his knee at work during a car accident in 2007 and has not worked since. (Tr. 74, 76.) Plaintiff stated that his past work also involved window installations and handyman work and that he had bought a truck and incorporated his own business after the car accident, in case he was able to return to work. (Tr. 74-75.)

Robert Baker, a vocational expert ("VE"), also testified at the hearing. (Tr. 83-91.) The VE testified that Plaintiff's former work as a carpenter was at a medium level of exertion, had a specific vocational preparation ("SVP") of 7, and was listed at DOT code 860.381-022. (Tr. 84.) The VE further testified that Plaintiff's former work as a machine cleaner was listed as helper/janitor, DOT code 381.687-018, involved medium level exertion, and had an SVP of 2. (Tr. 84-85.)

The ALJ then asked the VE to assume a hypothetical worker with Plaintiff's age, education, work experience, and the residual functional capacity ("RFC") to perform light work, except that he could only occasionally climb ramps and stairs; never climb ropes, ladders or scaffolds; occasionally balance, stoop, crouch, kneel and crawl; and should avoid exposure to unprotected heights or hazardous machinery. (Tr. 85.) When asked whether such a hypothetical worker could perform any of Plaintiff's past work as it had been actually performed by Plaintiff or as generally performed in the national economy, the VE replied no. (*Id*.) However, the VE testified that such a worker could perform the following light-level work: cleaner/housekeeper, DOT code 323.687-014, SVP of 2; marker II, DOT code 920.687-126, SVP of 2; and cleaner/polisher, DOT code 709.687-010, SVP of 2. (Tr. 85-86.)

For the second hypothetical, the ALJ asked the VE to assume a hypothetical worker with Plaintiff's age, education, work experience, and the RFC to perform sedentary work. (Tr. 86.) The VE testified that such a worker would not be able to perform Plaintiff's past relevant work but would be able to do sedentary work, including: order clerk (food and beverage), DOT 209.567-014, SVP of 2; callout operator, DOT code 237.367-014, SVP of 2; and telephone quotation clerk, DOT 237.367-046, SVP of 2. (Tr. 86-87.)

The ALJ's third hypothetical was the same as the second except that the hypothetical worker had the following additional limitations: he could occasionally climb ramps and stairs; could never climb ropes, ladders, or scaffolds; could occasionally balance, stoop, crouch, kneel and crawl; should avoid exposure to unprotected heights or hazardous machinery; required the ability to alternate sitting and standing at will provided that he is not off-task more than five percent of the workday; and was limited to jobs that can be performed while using a hand-held device. (Tr. 87.) The VE testified that such a worker would not be able to perform Plaintiff's past relevant work but would be able to perform the three sedentary jobs identified in response to the second hypothetical. (Tr. 87-88.)

The ALJ's fourth hypothetical was the same as the third except that the hypothetical worker needed to alternate sitting and standing positions every thirty minutes throughout the workday. (Tr. 88.) The VE testified that such a worker could not perform Plaintiff's prior relevant work but would be able to perform the three sedentary jobs identified in response to the second hypothetical so long as the worker remained on task for at least 85% of the workday. (Tr. 88-89.) The VE clarified that being off-task more than fifteen percent of the workday would rule out all employment. (Tr. 89.)

The ALJ's fifth hypothetical to the VE was the same as the fourth except that the hypothetical worker would be off-task twenty percent of the workday. (Tr. 89.) The VE testified that such a worker was unemployable. (Tr. 89.)

Plaintiff's counsel then asked the VE to consider a modified version of the ALJ's fourth hypothetical in which the hypothetical worker was further limited to reaching in all directions only on an occasional basis bilaterally. (Tr. 90.) The VE testified that such a worker could perform the job of callout operator, which he had identified earlier, because it only required occasional reaching. (90-91.)

Plaintiff's counsel then asked the VE to consider a hypothetical worker who could stand or walk for less than two hours, and sit less than six hours, in an eight-hour workday. (Tr. 91.) The VE testified that such a worker was unemployable. (*Id*.) Finally, Plaintiff asked the VE to consider a hypothetical worker who was limited to sedentary work with the following additional limitations: occasional lifting of less than ten pounds; occasional sitting and standing; pushing and pulling up to five pounds; no climbing, balancing, kneeling, crouching, crawling or stooping; and occasional reaching in all directions. (*Id*.) The VE testified that such a worker was unemployable. (*Id*.)

### b. Medical Evidence

#### i. Dr. Steven Zelicof

Dr. Steven Zelicof is an orthopedic surgeon who performed Plaintiff's right total knee replacement in March 2012. (Tr. 237-40, 337-40.) At a follow-up appointment on April 30, 2012, Dr. Zelicof noted that Plaintiff reported pain with stairs and walking, needed a cane for support, could walk more than ten blocks, and could go up/down stairs using a rail. (Tr. 330.)

Plaintiff was able to stand up from a chair without using his hands but experienced anterior knee pain and painful crepitus, both of which were noted as "improving." (*Id*.) Dr. Zelicof noted that Plaintiff was taking Oxycodone and scheduled a follow-up in six weeks. (*Id*.)

At the follow-up on June 11, 2012, Dr. Zelicof remarked that, "[o]verall, [Plaintiff] is definitely doing better after his right total knee replacement." (*Id*.) On examination, Plaintiff could flex the right knee to 115 degrees and had full extension, but he still had some weakness on the quadriceps and continued to experience some buckling or giving way associated mostly with quadriceps weakness. (*Id*.) Plaintiff also continued to use a cane for balance and felt knee discomfort. (*Id*.) Dr. Zelicof expected a long period of recovery due to Plaintiff's long history of knee problems, including ACL reconstruction and secondary arthrosis, and recommended physical therapy and aqua therapy. (*Id*.) Dr. Zelicof noted that Plaintiff reported pain with stairs and walking and needed a cane for support, but that Plaintiff could walk five to ten blocks and could go up/down stairs using a rail. (Tr. 329.) Plaintiff could not stand up from a chair without using his hands and experienced anterior knee pain and painful crepitus. (*Id*.) Dr. Zelicof noted that Plaintiff was taking Percocet and scheduled a follow up in six weeks. (*Id*.)

At the follow-up appointment on July 23, 2012, Plaintiff could flex the right knee to 130 degrees and had full extension, but he still reported pain with walking and stairs. (Tr. 328.) Dr. Zelicof noted that Plaintiff could walk five to ten blocks with the support of a cane and go up/down stairs using a rail. (*Id*.) Plaintiff could stand up from a chair without using his hands but experienced anterior knee pain and painful crepitus. (*Id*.) Dr. Zelicof noted that

Plaintiff was taking Percocet and this time scheduled a follow up in twelve weeks and opined that Plaintiff could "return to work light duty." (*Id.*)

On November 5, 2012, Plaintiff reported occasional pain and that he took Oxycodone for relief. (Tr. 320.) On examination of the right knee, Plaintiff had no pain, could flex to 120 degrees, had some instability, had unlimited walking ability with the support of a cane, had normal ability to go up/down stairs, could stand up from a chair without using his hands, and experienced no anterior knee pain or painful crepitus. (*Id.*) Dr. Zelicof asked Plaintiff to return for a follow-up in six months. (Tr. 321.)

On May 6, 2013, Dr. Zelicof reported that Plaintiff was "doing better" overall but still had some occasional stiffness in his right knee, particularly with standing for long periods of time. (Tr. 317.) Plaintiff's symptoms were aggravated by the weight he had gained, and he also reported some discomfort associated with his left knee. (*Id.*) On examination of the right knee, Plaintiff had no pain, could flex to 120 degrees "essentially painless," had some instability, had unlimited walking ability with the support of a cane, normal ability to go up/down stairs, could stand up from a chair without using his hands, and experienced no anterior knee pain or painful crepitus. (*Id.*) Dr. Zelicof asked Plaintiff to return for a follow-up in one year. (Tr. 318.)

On June 11, 2013, during a visit with Dr. Zelicof, Plaintiff reported that he was feeling "40%" better on a scale of 0-100%, but he also noted feeling the same since his last visit and rated the severity of his pain as "8" on a scale of 0-10. (Tr. 323.) Plaintiff described his pain as aching, constant, and disruptive of his sleep, and also reported numbness, weakness, feelings of the joint giving way, poor balance, locking/catching, and tingling. (*Id.*)

On July 22, 2013, during a visit with Dr. Zelicof, Plaintiff reported that he was feeling "50%" better on a scale of 0-100%, noted that he was feeling "better" since his last visit, and rated the severity of his pain as "7" on a scale of 0-10. (Tr. 331.) Plaintiff described his pain as sharp, aching, constant, and "comes and goes," and also reported numbness, weakness, feelings of the joint giving way, poor balance, locking/catching, and tingling. (*Id*.)

On a prescription note dated November 6, 2013, Dr. Zelicof opined that Plaintiff was 100% disabled. (Tr. 249.) In a physical therapy referral on the same date, Dr. Zelicof diagnosed residual weakness resulting from the right knee replacement. (Tr. 247.) In a "To Whom It May Concern" letter dated November 21, 2013, Dr. Zelicof opined that Plaintiff continued to have right knee instability despite the right knee replacement, and that he also had symptoms in his right foot and left knee due to his right knee injury. (Tr. 250.)

On March 6, 2014, Dr. Zelicof saw Plaintiff for continued right leg weakness status post total knee replacement. (Tr. 266-67.) Plaintiff used a cane and reported difficulty with prolonged walking and standing, an inability "to lift or carry heavy weight," and that he was taking Percocet. (Tr. 266.) On examination of the right knee, Plaintiff had moderate effusion, normal alignment, medial and lateral joint line tenderness, painful flexion from 0-120 degrees, and some lateral ligamentous laxity. (*Id*.) Dr. Zelicof opined that Plaintiff had a permanent partial disability due to a 70% loss of use of his right leg. (*Id*.) Dr. Zelicof also reported that Plaintiff was a candidate for the "ticket to work" program or a similar job retraining program so long as he could use his cane and pain medication as directed, and could avoid prolonged walking/standing or lifting more than 20 pounds. (*Id*.).

On February 11, 2015, Dr. Zelicof saw Plaintiff for a follow-up appointment, during which Plaintiff reported occasional episodes of instability in his right knee but that he felt somewhat better overall. (Tr. 304.) Plaintiff also reported using Percocet on a fairly regular basis without any side effects. (*Id*.) On examination of the right knee, Plaintiff had moderate effusion, normal alignment, medial and lateral joint line tenderness, flexion to 110 degrees that was minimally painful, and some ligamentous laxity in extension and mid flexion. (*Id*.) The left knee had moderate varus deformity that was correctable, medial joint line tenderness, and painful range of motion from 5 to 115 degrees with crepitus through arc of motion, but no effusion, no ligamentous laxity, and negative Lachman, anterior drawer, posterior drawer, pivot shift, McMurray, and bounce tests. (*Id*.) Dr. Zelicof diagnosed status post total knee replacement of the right knee and osteoarthritis of the left knee. (Tr. 305.)

On March 25 and May 28, 2015, Plaintiff saw Dr. Zelicof for a bilateral knee follow-up appointment. (Tr. 313-14, 351-52.) Plaintiff reported no significant improvement, wore a brace over both knees, walked with a cane for support, and took Percocet and Oxycodone, which relieved his symptoms. (Tr. 313, 351.) On examination of the right knee, Plaintiff had moderate effusion, normal alignment, medial and lateral joint line tenderness, flexion to 110 degrees that was minimally painful, and some ligamentous laxity in extension and mid flexion. (*Id*.) The left knee had moderate varus deformity that was correctable, medial joint line tenderness, and painful range of motion from 5 to 115 degrees with crepitus through arc of motion, but no effusion, no ligamentous laxity, and negative Lachman, anterior drawer, posterior drawer, pivot shift, McMurray, and bounce tests. (*Id*.) Dr. Zelicof diagnosed total

knee replacement of the right knee and osteoarthritis of the left knee and asked Plaintiff to return in three months. (Tr. 314, 352.)

In a "To Whom It May Concern" letter dated May 28, 2015, Dr. Zelicof opined that Plaintiff "remains unable to work due to his knee pain and symptoms" and "remains 100% disabled." (Tr. 301.) In a medical source statement also dated May 28, 2015, Dr. Zelicof noted that Plaintiff had a painful total knee replacement with installation that required revision. (Tr. 309.) Dr. Zelicof opined that Plaintiff could occasionally lift/carry less than ten pounds; push/pull a maximum of five pounds with the upper and lower extremities; could not stand or walk for more than five minutes at a time or two hours total in an eight-hour workday; could sit less than six hours in an eight-hour workday; needed to periodically alternate sitting and standing to relieve pain; could not perform postural activities due to his knee; had limited ability to reach in all directions and could reach only occasionally; and had limited tolerance for temperature extremes, noise, dust, vibration, humidity/wetness, hazards, and respiratory irritants. (Tr. 308-11.)

On June 10, 2015, Plaintiff returned to Dr. Zelicof for a bilateral knee follow-up. (Tr. 353-54.) Dr. Zelicof noted that Plaintiff was still waiting for Worker's Compensation to authorize revision surgery of his right total knee replacement, the hardware for which had become loose in the knee. (Tr. 353.) Plaintiff reported continued pain in both knees. (*Id*.) On examination, the right knee had moderate effusion, normal alignment, medial and lateral joint line tenderness, range of motion from 0 to 110 degrees that was minimally painful, and evidence of ligamentous laxity in extension and mid-flexion. (*Id*.) The left knee had moderate varus deformity that was correctable, medial joint line tenderness, and painful range of

motion from 5 to 115 degrees with crepitus through arc of motion, but no effusion, no ligamentous laxity, and negative Lachman, anterior drawer, posterior drawer, pivot shift, McMurray, and bounce tests. (*Id*.) Dr. Zelicof diagnosed status post right total knee replacement and left knee osteoarthritis and asked Plaintiff to return in six weeks. (Tr. 353-54.)

On February 10, 2016, Plaintiff returned to Dr. Zelicof for routine evaluation of both knees.[1] (Tr. 32-33.) Dr. Zelicof noted that Plaintiff was still waiting for Workers Compensation to authorize revision surgery of his right total knee replacement. (Tr. 32.) Plaintiff denied any change in his symptoms and continued to ambulate with a cane and take his pain medication on an as-needed basis. (*Id*.) On examination, the right knee had moderate effusion, normal alignment, medial and lateral joint line tenderness, range of motion from 0 to 110 degrees that was minimally painful, and evidence of ligamentous laxity in extension and mid-flexion. (*Id*.) The left knee had moderate varus deformity that was correctable, medial joint line tenderness, and painful range of motion from 5 to 115 degrees with crepitus through arc of motion, but no effusion, no ligamentous laxity, and negative Lachman, anterior drawer, posterior drawer, pivot shift, McMurray, and bounce tests. (*Id*.) Dr. Zelicof diagnosed a mechanical loosening of the internal right knee prosthetic joint and unilateral primary osteoarthritis in the left knee and asked Plaintiff to return in six weeks. (Tr. 32-33.)

---

[1] The Court notes that this portion of the medical evidence as well as Dr. Mann's February 29, 2016 opinion post-date the ALJ's decision. It is unclear whether the Appeals Council considered this later evidence when upholding the ALJ's decision. Nonetheless, this medical evidence does not alter the Court's ruling because this evidence is not materially different than the evidence already before the ALJ. *See Suttles v. Colvin*, 654 F. App'x 44, 47 (2d Cir. 2016).

### ii. Dr. Marc Samolsky

In January through June 2013, Plaintiff received pain management from Dr. Marc Samolsky. (Tr. 290-95.) Dr. Samolsky noted that Plaintiff tolerated Percocet without side effects and that his pain ranged from a 2 to 8/10 in intensity. (*Id*.)

### iii. *Dr. A. Auerbach*

Dr. A. Auerbach, a medical consultant for the SSA, completed a Physical Residual Functional Capacity Assessment dated September 25, 2013, based on a review of Plaintiff's medical records. (Tr. 241-46.) In that assessment, Dr. Auerbach made specific reference to the CDIU Report, noting that from October 2012 through July 2013, Plaintiff had been observed able to get into and out of a vehicle without any obvious difficulties and to have a normal gait pattern without needing to use a cane. (Tr. 242.) Dr. Auerbach opined that Plaintiff could perform light work. (*Id*.) Dr. Auerbach also specifically assessed that Plaintiff could occasionally lift and/or carry up to twenty pounds, frequently lift/carry up to ten pounds, stand and/or walk for a total of six hours, sit for a total of six hours in an eight-hour workday, and push/pull without limitation. (*Id*.) Dr. Auerbach further assessed that Plaintiff could occasionally climb ramps, stairs, ladders, ropes or scaffolds, and occasionally balance, stoop, kneel, crouch or crawl. (Tr. 242-43.)

### iv. *Dr. Ronald Mann*

On May 22, 2013, Plaintiff underwent an independent medical examination with orthopedic surgeon Dr. Ronald Mann for Worker's Compensation purposes at the request of Plaintiff's insurer. (Tr. 261-64.) Plaintiff reported right knee stiffness with decreased motion and clicking. (Tr. 261.) On examination of the right knee, Dr. Mann noted that

Plaintiff walked with a cane and had a limping gait. (Tr. 262.) He also had mild quadriceps atrophy, mild positive clicking consistent with total knee replacement, minimal swelling, mild tenderness, no effusion, no instability, and range of motion from 0-95 degrees. (*Id*.) Plaintiff's left knee had normal range of motion. (*Id*.) Dr. Mann opined that Plaintiff had a moderate degree of disability related to his right knee. (Tr. 263.)

On November 25, 2013, Plaintiff returned to Dr. Mann for Worker's Compensation purposes at the request of the insurer. (Tr. 257-60.) Plaintiff reported that his right knee had not been doing well and was stiff, had reduced range of motion, made clicking sounds, and was swollen. (Tr. 257.) On examination, Dr. Mann noted that Plaintiff walked with a cane and had a limping gait. (Tr. 258.) He also had mild quadriceps atrophy, clicking and crepitus around the right knee, minimal swelling, no instability, and range of motion from 0-95 degrees. (*Id*.) Dr. Mann opined that Plaintiff had a moderate, partial degree of disability related to his right knee. (Tr. 259.) Dr. Mann further assessed that Plaintiff could do "light-duty work avoiding walking, kneeling or bending on his affected right knee," should avoid lifting more than twenty pounds due to right knee weakness, and needed to use a cane. (Tr. 259.)

On March 6, 2015, Plaintiff returned to Dr. Mann for Worker's Compensation purposes. (Tr. 343-48.) Plaintiff complained of pain and stiffness in his right knee, which also gave way, pain in his left knee and right foot, limping, and difficulty with stairs. (Tr. 344.) Dr. Mann noted that Plaintiff was obese, walked with a cane, and had a limping gait pattern. (*Id*.) On examination of the right knee, Dr. Mann found mild quadriceps atrophy, clicking, no effusion or swelling, no gross instability, some tenderness on manipulation, and range of

motion of 0 to 110 degrees (out of 130). (*Id*.) The left knee had normal range of motion, mild

tenderness on the anterior portion, mild crepitus, negative Apley's and McMurray tests, and

no swelling or effusion. (*Id*.) His right foot had mild tenderness diffusely and flat footedness,

but no swelling and normal range of motion. (*Id*.) Dr. Mann assessed a marked partial

degree of disability for Worker's Compensation purposes and opined that Plaintiff could

return to work in a sedentary capacity, but should avoid prolonged walking, standing, or

lifting more than fifteen pounds, and be allowed to sit, stand, and walk as necessary for

relief of his knee pain. (Tr. 345)

Plaintiff again returned to Dr. Mann on February 29, 2016, for Worker's

Compensation purposes. (Tr. 35-39.) Plaintiff complained of pain and stiffness in his right

knee, which also gave way, and pain in his left knee and both feet. (Tr. 36.) Dr. Mann noted

that Plaintiff was obese, walked with a cane, and had a limping gait pattern. (*Id.*) On

examination of the right knee, Dr. Mann found mild quadricep atrophy, tenderness and

instability with manipulation, some laxity to varus and valgus stress, mild anterior drawer

sign, no swelling, and range of motion of 0 to 110 degrees (out of 130). (*Id*.) The left knee had

normal range of motion, mild tenderness on the anterior portion, mild crepitus, and no

swelling, effusion, or instability. (*Id*.) Both feet had mild tenderness diffusely and flat

footedness, but no swelling and normal range of motion. (*Id*.) Dr. Mann opined that Plaintiff

could return to work in a sedentary capacity, but should avoid prolonged walking or standing,

and be allowed to sit, stand, and walk as necessary for relief of his knee pain. (Tr. 37.)

### v. Dr. David T. Yung

In a "To Whom It May Concern" letter dated March 6, 2014, Dr. David T. Yung, an internist, noted that Plaintiff had been seen on February 27, 2014 for complaints of pain, weakness, and "disability in his right leg." (Tr. 256.) Dr. Yung estimated a "70% loss of use of right leg" and opined that Plaintiff needed to use a cane and pain medication. (*Id*.) He also opined that Plaintiff should avoid prolonged walking, knee bending or standing, and could not lift more than twenty pounds. (*Id*.)

### vi. Dr. Richard Weinstein

On March 3, 2014, Dr. Richard N. Weinstein, an orthopedics doctor, examined Plaintiff and found that his right knee had some effusion and tenderness in the medial and lateral joint lines and clicking anteriorly, but that he had negative Lachman and posterior drawer tests, and no varus/valgus instability. (*Id*.) The left knee had 120 degrees of flexion (out of 135), marked tenderness in the medial joint line and slight tenderness in the lateral joint line, some effusion, positive McMurray, and position flexion pinch, but no instability with negative Lachman's and posterior drawer tests, negative varus and valgus instability, and good motor strength without atrophy. (*Id*.)

### vii. Dr. James R. McWilliam

On July 9, 2014, Plaintiff was seen by Dr. James R. McWilliam for bilateral foot pain. (Tr. 297-99.) On examination, Plaintiff had mild swelling and tenderness in the posterior tibial tendon, and give way weakness in the tibialis posterior, but full range of motion in the ankle and hind foot. (Tr. 298.) An x-ray revealed pes planus with collapse at the navicular cuneiform joint and mild forefoot abduction. (*Id*.) Dr. McWilliam assessed tibialis tendonitis,

late effect of tendon injury, and bilateral posterior tibial tendon insufficiency that was likely

the result of long-standing gait disturbance. (Tr. 299.) Dr. McWilliam recommended an airlift

brace and weight-bearing as tolerated. (*Id*.)

### viii.   Physician Assistant Courtney Leonard Kahn

On a prescription note dated September 4, 2014, Physician Assistant Courtney

Leonard Kahn remarked that Plaintiff "qualifies for SS disability due to injury." (Tr. 279.)

### c.   The ALJ's Decision

In an August 27, 2015 decision, the ALJ found that though Plaintiff was disabled

through July 26, 2013 due to his bilateral knee impairments that met Listing 1.03

(reconstructive surgery or surgical arthrodesis of a joint(s) (due to any cause)), Plaintiff

experienced medical improvement and his disability ended as of September 27, 2013. (Tr. 11-

28.)

Applying the eight-step framework for adjudicating Social Security disability claims

involving medical improvements, the ALJ found that, since September 27, 2013, Plaintiff did

not have an impairment or combination of impairments that met or medially equaled the

severity of a listed impairment, including Listing 1.02 (major dysfunction of a joint(s) (due to

any cause)), 1.03, or 1.06 (fracture of the femur, tibia, pelvis or one or more of the tarsal

bones). (Tr. 13-14.) The ALJ found that the medical improvement related to Plaintiff's ability

to work because, as of September 27, 2013, Plaintiff's impairments no longer met or

medically equaled Listing 1.03. (Tr. 14.) However, the ALJ found that as of September 27,

2013, Plaintiff's medically-determined impairments were severe and thus required an

assessment of Plaintiff's RFC. (Tr. 15.)

The ALJ found that, as of September 27, 2013, Plaintiff had the RFC to perform sedentary work but with the following limitations: he could occasionally climb ramps and stairs; could never climb ropes, ladders, or scaffolds; could occasionally balance, stoop, crouch, kneel, or crawl; could not be exposed to unprotected heights or hazardous machinery; needed to be able to alternate between sitting and standing at will so long as he was not off-task for more than five percent of the workday; and was limited to jobs that could be performed while using a handheld device. (Tr. 15.)

The ALJ further found that, as of September 27, 2013, Plaintiff was unable to perform his past relevant work as a carpenter/window technician or machine cleaner. (Tr. 21.) However, the ALJ found that there was a significant number of jobs in the national economy that Plaintiff remained able to perform, and, consequently, Plaintiff's disability ended as of September 27, 2013. (Tr. 21-23.)

## DISCUSSION

### I.    *The Applicable Law*

#### a.    *Judicial Standard Of Review Of Commissioner's Determination*

The court's review of an appeal of a denial of disability benefits is limited to two inquiries. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. *Id*. So long as they are supported by substantial evidence in the Administrative Record, the findings of the ALJ after a hearing as to any facts are conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3).

An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g.*, *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 993 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his or her reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 429 (N.D.N.Y 2008).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). Thus, the court does not determine *de novo* whether a claimant is disabled. *Id.* (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." 42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (*per curiam*), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (internal quotation marks omitted), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Eriksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d 260, 268-69 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-cv-1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded treating physician evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)). If the decision denying benefits applied the correct legal standards and is based on substantial evidence, the reviewing court must affirm; if not, the court may modify or reverse the decision, with or without remand. 42 U.S.C. § 405(g).

### b. Legal Principles Applicable To The Commissioner's Disability And Medical Improvement Determinations

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

After an individual has been found to be entitled to social security benefits, his or her benefits may be terminated if there is substantial evidence that a medical improvement has restored his or her ability to work. *De Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984). Such a finding must be supported by substantial evidence demonstrating that "there has been [a] medical improvement in the individual's impairment or combination of impairments . . . , and [that] the individual is now able to engage in substantial gainful activity." 42 U.S.C. § 423(f). A "medical improvement" means any decrease in the medical severity of the claimant's impairment(s) which was present at the time of the most recent favorable medical decision that the claimant was disabled or continued to be disabled. 20 C.F.R. § 404.1594(b)(1). The medical improvement must be demonstrated by changes or improvements in "the symptoms, signs, or laboratory findings associated with [a claimant's] impairment(s)." *Id.* Thus, "[i]n order to determine whether medical improvement has

occurred, [the ALJ] must compare the current medical severity of the impairment to the medical severity of that impairment at the time of the most recent favorable medical decision." *Veino v. Barnhart*, 312 F.3d 578, 586-87 (2d Cir. 2002).

To determine whether or when a claimant has medically improved and is no longer entitled to benefits, the SSA regulations outline an eight-step evaluation process.

The eight steps are:

(1) whether the claimant is engaged in substantial gainful activity;

(2) if not, whether any of the claimant's impairments meets or equals the severity of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations ("Listing");

(3) if not, whether there has been a "medical improvement" demonstrated by a decrease in medical severity;

(4) if so, whether the medical improvement was related to the claimant's ability to do work (*i.e.*, whether there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination);

(5) if there has been no finding of medical improvement at step three, or if any medical improvement was found not to relate to an ability to work at step four, whether the exceptions listed in paragraphs (d) and (e) of the relevant section apply;

(6) if medical improvement is shown to be related to ability to do work, or if one of the relevant exceptions apply, whether all of the claimant's current impairments in combination are severe;

(7) if so, whether claimant can perform previous work based upon an assessment of the

claimant's residual functional capacity considering all of the claimant's current

impairments; and

(8) if claimant is unable to perform past work, whether, given claimant's residual

functional capacity and considering the claimant's age, education, and past work

experience, other work exists in the national economy that the claimant can perform.

20 C.F.R. § 404.1594(f)(1)-(8). The burden rests with the Commissioner at every step to show,

by substantial evidence, that a medical improvement has occurred. *Baker v. Comm'r of Soc.

Sec.*, No. 3:12-cv-1715 (TJM), 2014 WL 1280306, at *5 (N.D.N.Y. Mar. 27, 2014).

### c. Duty To Develop The Record

In Social Security proceedings, the ALJ must affirmatively develop the record on behalf

of all claimants. *See Moran,* 569 F.3d at 108, 112. As part of this duty, the ALJ must investigate

the facts and develop the arguments both for and against granting benefits. *Id.* Specifically,

under the applicable regulations, the ALJ is required to develop a claimant's complete medical

history. *Pratts,* 94 F.3d at 34, 37 (citing 20 C.F.R. §§ 404.1512(d)-(f)). This responsibility

"encompasses not only the duty to obtain a claimant's medical records and reports, but also

the duty to question the claimant adequately about any subjective complaints and the impact

of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue,* No. 07-cv-

11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (internal citations omitted).

Whether the ALJ has met his/her duty to develop the record is a threshold question.

Before reviewing whether the Commissioner's final decision is supported by substantial

evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided

plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record." *Scott v. Astrue,* No. 09-cv-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (internal quotations and citations omitted). The ALJ must develop the record even where the claimant has legal counsel. *Perez,* 77 F.3d at 47. Remand is appropriate where this duty is not discharged. *See, e.g., Moran,* 569 F.3d at 114-15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### d. *Treating Physician Rule*

In considering the evidence in the record, the ALJ must give deference to the opinions of a claimant's treating physicians. A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). "The opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record." *Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016).

The ALJ must give "good reasons" for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993). Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given, including: (1) the length of the treatment relationship and the frequency of examination, (2) the

nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2); *Schisler*, 3 F.3d at 567. The Second Circuit has made clear that the ALJ need not "slavish[ly] recit[e] . . . each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013). As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

### e. Credibility

It is within the ALJ's "discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence," regarding the true extent of a claimant's alleged symptoms. *Marcus*, 615 F.2d at 27. When the ALJ rejects a plaintiff's testimony in light of objective medical evidence and other factors he deems relevant, he must explain that decision "with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Calzada*, 753 F. Supp. 2d at 280 (quoting *Fox v. Astrue*, No. 05-cv-1599 (NAM), 2008 WL 828078, at *12 (N.D.N.Y. Mar. 26, 2008)). "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant." *Aponte v. Sec'y, Dep't Health and Human Servs.*, 728 F. 2d 588, 591 (2d Cir. 1984) (internal citation omitted). A court must defer to an

ALJ's finding and uphold the ALJ's decision to discount a claimant's subjective complaints if the finding is supported by substantial evidence. *Id.* (internal citations omitted).

## II.    *Application Of The Legal Standards To Plaintiff's Claim*

### a.    *Development Of The Record*

Before turning to the issue of whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), the Court first notes that it is satisfied that the ALJ provided Plaintiff with a full hearing and also fully and completely developed the administrative record as required by 20 C.F.R. § 404.1512(d).

### b.    *Analysis Of The ALJ's Decision*

The Court finds that the ALJ committed no legal error and that substantial evidence supports the ALJ's decision at each step of the eight-step medical improvement analysis. The Court addresses below only disputed issues raised by the Parties in the Joint Stipulation.

#### i.    *Step Two Of The Medical Improvement Analysis*

Plaintiff first argues that the ALJ erred at the second step of the medical improvement analysis when he found that Plaintiff did not meet or equal the severity of an impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. In so finding, the ALJ properly considered Listings 1.02, 1.03, and 1.06.

Listing 1.02 lists major dysfunctions of a joint due to any cause, characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s), with either (A) an inability to ambulate effectively or (B) involvement of one major

peripheral joint in each upper extremity resulting in inability to perform fine and gross movements effectively. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.02.

Listing 1.03 requires reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset. *Id.* § 1.03. Listing 1.06 requires fracture of the femur, tibia, pelvis, or one or more of the tarsal bones with "(A) Solid union not evident on appropriate medically acceptable imaging and not clinically solid;" and "(B) [i]nability to ambulate effectively . . . and return to effective ambulation did not occur or is not expected to occur within 12 months of onset." *Id.* § 1.06.

Thus, Listings 1.02, 1.03, and 1.06 all require Plaintiff to demonstrate an inability to ambulate effectively. An inability to ambulate effectively means "an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* §1.00(B)(2)(b). To ambulate effectively means that

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* § 1.00(B)(2)(b)(2).

Here, Plaintiff argues that he meets the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1 because he required use of a cane to ambulate effectively, was regularly taking Percocet or Oxycodone to relieve his pain, and because Dr. Zelicof noted that Plaintiff was unable to stand or walk for longer than five minutes. However, as the Commissioner points out, ambulation with a single cane is not enough to demonstrate ineffective ambulation for the purpose of these Listings. *See Hilliard v. Colvin*, 13-cv-1942 (AJP), 2013 WL 5863546, at *13 (S.D.N.Y. Oct. 31, 2013) ("evidence clearly showed that [claimant] could ambulate effectively" where "she used only one cane (not two)"). Further, in November 2012 and May 2013, Dr. Zelicof assessed that, despite some instability, Plaintiff's walking ability was unlimited with the support of a cane and that he had ability to go up/down stairs. (Tr. 320, 317). Additionally, the CDIU Report evidenced that on several instances in 2012 and 2013, Plaintiff was observed ambulating effectively without use of a cane. (Tr. 285-88.) Finally, Plaintiff himself testified that he could walk "500 to a thousand feet with no problem probably." (Tr. 71). Thus, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not meet or equal the severity of the impairments in Listings 1.02, 1.03, and 1.06.

### ii. Plaintiff's Medical Improvement And Residual Functional Capacity

Next, Plaintiff contends that the ALJ erred in making his RFC determination. In response, the Commissioner argues that Plaintiff experienced medical improvement related to his ability to work and that the ALJ's RFC determination is supported by substantial evidence.

In March of 2012, Plaintiff underwent total right knee replacement surgery and was found disabled under Listing 1.03 due to severe bilateral knee impairments. (Tr. 13.) Thereafter, Plaintiff experienced pain on a scale of 8/10, occasional stiffness, walked with a cane, and had a limping gait. (Tr. 322, 323, 261, 292, 293, 317.) However, the ALJ correctly found that Plaintiff experienced a decrease in medical severity by at least September 27, 2013. (Tr. 13.) In May 2013, Dr. Zelicof reported that Plaintiff was "overall doing better" and that Plaintiff had no limitations in his ability to walk with the use of a cane. (Tr. 317.) In post-surgery follow-up reports in June and July 2013, Plaintiff reported that he was doing 40 and 50 percent better, respectively. (Tr. 323, 331.) Further, the CDIU reports investigating Plaintiff from October 2012 to July 2013 demonstrate that Plaintiff was observed sitting for longer than 30 minutes while driving and was able to ambulate effectively with a normal gait pattern without the use of a cane. (Tr. 285-88.) Thus, substantial evidence supports the ALJ's finding that Plaintiff experienced medical improvement.

Substantial evidence also supports the ALJ's finding that Plaintiff's medical improvement related to his ability to work. Specifically, on May 22, 2013, Dr. Mann conducted an independent orthopedic evaluation of Plaintiff and opined that Plaintiff could return to work in a light-duty capacity. (Tr. 261-63.) Further, Dr. Auerbach completed a Physical RFC Assessment on September 25, 2013 based on a review of Plaintiff's medical records and found that Plaintiff was likely "capable of sustaining work commensurate with a light exertional level." (Tr. 242.)

Finally, the ALJ's finding that Plaintiff had the RFC to perform sedentary work except that he could occasionally climb ramps and stairs; could never climb ropes, ladders, or

scaffolds; could occasionally balance, stoop, crouch, kneel, or crawl; could not be exposed to unprotected heights or hazardous machinery; needed to be able to alternate between sitting and standing at will so long as he was not off-task for more than five percent of the workday; and was limited to jobs that could be performed while using a handheld device is also supported by substantial evidence. (Tr. 15). As stated above, in May 2013, Dr. Mann examined Plaintiff and observed that although Plaintiff experienced minimal swelling, mild tenderness, and a limited range of motion in the right knee, Plaintiff could return to work in a light-duty capacity. (Tr. 263.) Dr. Mann opined that Plaintiff should avoid prolonged walking, kneeling, or bending on the right knee. (*Id*.) Dr. Mann examined Plaintiff on two more occasions in March 2015 and February 2016, again opining that Plaintiff was capable of sedentary capacity work so long as Plaintiff avoided prolonged standing or walking and was allowed to sit and stand as necessary for pain relief. (Tr. 37, 345.)

Similarly, in September 2013, Dr. Auerbach opined that Plaintiff was capable of light-exertional level work. (Tr. 242.) In support of his opinion, Dr. Auerbach noted that despite Plaintiff's "wobbly gate," the CDIU observed Plaintiff from October 2012 to July 2013 walking with a normal gait pattern without use of a cane and getting into and out of vehicles without any obvious difficulties. (*Id.*) Dr. Auerbach also opined that Plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, and was capable of standing and/or walking and sitting about six hours in an eight-hour day with an unlimited ability to push and pull. (*Id*.) Finally, Dr. Auerbach indicated that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 243.)

Further, Plaintiff's own treating physician, Dr. Zelicof, opined in March 2014 that although Plaintiff had a "permanent partial disability" and 70% loss of use of the right leg, Plaintiff "is a candidate for ticket to work program or similar job retraining program" so long as Plaintiff had the ability to use his cane and pain medication, avoid prolonged walking or standing, and lift/carry less than twenty pounds. (Tr. 266.) The ALJ's decision is also consistent with Dr. Yung's opinion that Plaintiff needed to use a cane and pain medication, should avoid prolonged walking, knee bending or standing, and could not lift more than twenty pounds. (Tr. 268)

Finally, Plaintiff himself testified that he was capable of walking 500 to 1000 feet and could sit ten minutes before changing positions, and could stand for five minutes without changing positions, which is consistent with the ALJ's residual functional capacity finding that Plaintiff could perform sedentary work and must be permitted to alternate sitting and standing positions at will. (Tr. 15, 71-72.) Thus, substantial evidence supports the ALJ's RFC determination.

In light of Plaintiff's RFC of sedentary work, the ALJ correctly found Plaintiff could not perform his past relevant work as a construction worker. (Tr. at 21.) The ALJ also reasonably determined that Plaintiff was able to perform other work in the national economy considering his age and education. (Tr. 21-22.) The ALJ reasonably relied on a vocational expert, who testified that an individual with Plaintiff's RFC and vocational profile could perform the unskilled, sedentary work of an order clerk (DOT No. 209.567-014), call-out operator (DOT No. 237.367-014), or a telephone quotation clerk (DOT No. 237.367-046). (Tr. 22.) Having carefully considered the whole record and examined evidence from both sides, the Court finds the

ALJ's conclusions that Plaintiff's medical condition had improved and that his improvement was work-related are supported by substantial evidence.

### c. The Treating Physician Rule

Plaintiff next contends that the ALJ gave improper weight to Plaintiff's treating physician's (Dr. Zelicof) November 2013 and May 2015 opinions and that the ALJ erred in failing to explain his reasoning for giving Dr. Zelicof's opinions little weight.

In a prescription note signed on November 6, 2013, Dr. Zelicof opined that Plaintiff was 100% disabled. (Tr. 249.) In a letter dated November 21, 2013, Dr. Zelicof reported that Plaintiff continued to have instability affecting his ability to work and that Plaintiff was therefore unable to return to work. (Tr. 273.) On May 28, 2015, Dr. Zelicof opined that Plaintiff continued to be disabled. (Tr. 301.) Finally, in a medical source statement also dated May 28, 2015, Dr. Zelicof opined that Plaintiff could occasionally lift/carry less than ten pounds; push/pull a maximum of five pounds with the upper and lower extremities; could not stand or walk for more than five minutes at a time or two hours total in an eight-hour workday; could sit less than six hours in an eight-hour workday; needed to periodically alternate sitting and standing to relieve pain; could not perform postural activities due to his knee; had limited ability to reach in all directions and could reach only occasionally; and had limited tolerance for temperature extremes, noise, dust, vibration, humidity/wetness, hazards, and respiratory irritants. (Tr. 308-11).

As an initial matter, it was not erroneous for the ALJ to give little weight to Dr. Zelicof's statements that Plaintiff is "disabled." It is well established that a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling" because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, No. 09-cv-3928 (PKC), 2011 WL 666194, at *10

(S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Moreover, Dr. Zelicof's statements about Plaintiff's ability to work and his functional limitations are not well-supported by Dr. Zelicof's own treatment notes or the rest of the medical evidence. For example, Dr. Zelicof's November 2013 and May 2015 opinions conflict with his March 2014 opinion in which he found Plaintiff a candidate for a ticket to work program so long as he could use his cane, pain medication, and could avoid prolonged walking, standing, and carrying items more than twenty pounds. (Tr. 276-77.) His statements also conflict with other medical evidence. For example, in November 2013, Dr. Mann examined Plaintiff and assessed that, though Plaintiff's right knee had a limited range of motion and tenderness upon examination, Plaintiff was capable of doing light-duty work so long as he could use a cane, lift no more than twenty pounds, and avoid walking, kneeling, or bending on his right knee. (Tr. 259.) Similarly, in March 2015, Dr. Mann examined Plaintiff and found that Plaintiff had a marked partial degree of disability for Worker's Compensation purposes but could nonetheless return to work in a sedentary capacity so long as he avoided prolonged walking, standing, or lifting more than fifteen pounds, and as allowed to sit, stand, and walk as necessary for relief of his knee pain. (Tr. 345.) Dr. Zelicof's opinions regarding Plaintiff's limitations and ability to work also conflict with Dr. Auerbach's assessment that Plaintiff was capable of sustaining a light exertional level. (Tr. 242.)

Plaintiff further contends that the ALJ failed to explain why he assigned Dr. Zelicof's opinions only limited weight. Although the ALJ did not explicitly go through the six-step framework in 20 CF.R. § 404.1527(c)(2) for evaluating a treating physician's opinion, the ALJ did,

in fact, explain why he was not affording controlling weight to Dr. Zelicof's November 2013 and

May 2015 opinions. Specifically, he stated that Dr. Zelicof's opinions were inconsistent with his

own March 2014 opinion without an evidentiary basis for the variance and conflicted with

other medical evidence in the record. (R. at 16, 19.) After carefully considering the entire record

and the ALJ's opinion, this Court concludes that the ALJ "applied the substance of the treating

physician rule" and provided good reasons for affording less weight to Dr. Zelicof's opinion. *See*

*Halloran*, 362 F.3d at 31-32. The Court notes that the Parties do not dispute that the ALJ

properly applied the treating physician rule to Plaintiff's other treating physicians.

### d. *Credibility Determination*

Plaintiff argues that the ALJ erred in basing his credibility determination on the nature

of Plaintiff's conservative medical treatment, Plaintiff's sporadic employment history, and the

fact that Plaintiff did not display debilitating symptoms while testifying during the

administrative hearing. Although the ALJ did note these facts as part of his credibility

determination, the ALJ did not rely solely on these facts. The ALJ considered numerous other

factors, and substantial evidence supports the ALJ's decision to discount Plaintiff's subjective

complaints. Further, contrary to Plaintiff's assertion, the ALJ was entitled to consider his

observation of Plaintiff's demeanor during the hearing. *See Morales v. Comm'r of Soc. Sec.*,

No. 10-cv-8773 (BSJ) (KNF), 2012 WL 124554, at *19 (S.D.N.Y. Jan. 17, 2012). The conservative

nature of treatment is also a factor that the ALJ is permitted to consider as part of the broader

credibility analysis. *See, e.g., Mechelson v. Colvin*, 15-cv-0650 (JS), 2017 WL 4402455, at *12

(E.D.N.Y. Sept. 30, 2017) ("Additionally, the ALJ also appropriately noted the conservative

nature of Plaintiff's treatment" in evaluating plaintiff's credibility). Further, the ALJ may

consider Plaintiff's employment history, though the Second Circuit has cautioned that consideration of a claimant's work history must be undertaken with great care. *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998).

Even if the ALJ incorrectly found that Plaintiff's medical treatment was conservative, other relevant factors support his ultimate credibility determination. *See Otanez v. Colvin*, No. 14-cv-8184 (KPF), 2016 WL 128215, at *13 (S.D.N.Y. Jan. 12, 2016) ("Nevertheless, in light of the ALJ's explicit consideration of other relevant factors and the substantial evidence that exists in support of his ultimate determination, his perhaps undue emphasis on the conservative nature of Otanez's treatment recommendations does not invalidate his otherwise well-supported credibility determination."). For example, the ALJ reasonably found that Plaintiff's allegations of a complete inability to work conflicted with other evidence. As noted by the ALJ, in August 2015 Plaintiff's testimony regarding his activities of daily living including driving, going to the gym and working out on exercise mats, cooking or using the microwave to prepare his own meals on a daily basis, doing his own laundry, shopping every few days independently, cleaning his wooden floors with a Swiffer, and wiping the counters down at his home was inconsistent with his claim of complete disability. (Tr. 70, 77-80.) The ALJ also correctly observed that the weight of the medical opinion evidence, including Dr. Zelicof's opinion in March 2014 that Plaintiff was capable of sedentary work, belies Plaintiff's claim of complete disability. (Tr. 20.) Additionally, the ALJ properly noted the CDIU Report concerning Plaintiff's observed ability to stand and walk without using a cane, drive for extended periods, and enter and exit a vehicle, all without any observable indicia of discomfort. (Tr. 20.) Further, the Court notes that on Plaintiff's October 2013 application for

a parking permit/license plate for persons with severe disability, Plaintiff indicated that he was unable to walk 200 feet without stopping. (Tr. 248.) However, Plaintiff testified at the administrative hearing that he was able to walk 500-1000 feet with no problem, (Tr. 71), indicating Plaintiff's potential willingness to exaggerate his incapacity when it suits him or, alternatively, indicating that Plaintiff's condition has admittedly improved.

Accordingly, the ALJ's findings were sufficiently consistent with the evidence in the record and the Court rejects Plaintiff's contention that the ALJ failed to properly assess Plaintiff's credibility.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is DENIED, and the Commissioner's motion is GRANTED. The Clerk of Court is respectfully directed to close this case.

Dated:   February 12, 2018
         New York, New York

_____
        KATHARINE H. PARKER
    United States Magistrate Judge



**President**
Carol A. Sigmond

**President-Elect**
Michael J. McNamara

**Vice President**
Stephen C. Lessard

**Secretary**
Megan P. Davis

**Treasurer**
Vincent T. Chang

**Immediate
Past President**
Lewis F. Tesser

September 15, 2016

**Notice to all plaintiffs who have <u>Social Security cases</u> and <u>SSI</u> cases:**

You have started a lawsuit in federal court against the Social Security Administration.  <u>If you cannot afford a lawyer, you may qualify for free legal representation.</u>

The New York County Lawyers Association has provided free legal assistance to thousands of people who cannot afford lawyers.  We have a program which provides lawyers in Social Security and SSI cases in federal court.

<u>The program is free</u>.  The lawyers in our program are well-trained in Social Security law and have the resources that they need to represent you capably and zealously.

If you would like to consult with one of our lawyers, please call Carolyn A. Kubitschek, at 212-349-0900, or email Lois Davis, ldavis@nycla.org.  We cannot promise that everyone who calls will get a lawyer, but we are committed to providing as many individuals as possible with free legal representation.

Sincerely,

Carol A. Sigmond
President
New York County Lawyers Association